## UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND

| | |
|---|---|
| THOMAS LUCEY, Derivatively on Behalf of Nominal Defendant 2U, INC., | |
| Plaintiff, | |
| v. | **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT** |
| **CHRISTOPHER J. PAUCEK, CATHERINE A. GRAHAM, HARSHA MOKKARALA, PAUL A. MAEDER, ROBERT M. STAVIS, GREGORY K. PETERS, TIMOTHY M. HALEY, VALERIE B. JARRETT, EARL LEWIS, CORETHA M. RUSHING, SALLIE L. KRAWCHECK, JOHN M. LARSON, EDWARD S. MACIAS, ALEXIS MAYBANK, and MARK J. CHERNIS,** | **JURY TRIAL DEMANDED**<br><br>**CASE NO.:** |
| Defendants, | |
| and | |
| 2U, INC., | |
| Nominal Defendant. | |

Plaintiff Thomas Lucey ("Plaintiff"), by and through his undersigned attorneys, brings this derivative complaint for the benefit of nominal defendant, 2U, Inc. ("2U" or the "Company"), against its Board of Directors (the "Board") and certain of its executive officers seeking to remedy defendants' breaches of fiduciary duties, Contribution for Violations of Sections 10(b) and 21D of the Securities Exchange Act of 1934 (the "Exchange Act"), and insider trading (i.e. *Brophy* claim). Plaintiff's allegations are based upon his personal knowledge as to himself and his own acts, and upon information and belief, developed from the investigation and analysis by Plaintiff's counsel, including a review of publicly available information, including filings by 2U with the U.S. Securities

1

and Exchange Commission ("SEC"), press releases, news reports, analyst reports, investor conference transcripts, publicly available filings in lawsuits, and matters of public record.

I.      NATURE AND SUMMARY OF THE ACTION

1.      2U partners with nonprofit colleges and universities to offer online degree programs. It has two segments: a Graduate Program for students seeking a full graduate degree; and a Short Course for working professionals seeking advancement through skills attainment.

2.      Between February 26, 2018 and July 30, 2019, the Company touted its marketing capabilities as being cost efficient and effective to attract students to its programs, even as 2U continued to grow in size and complexity.  On May 25, 2018, the Company completed a secondary public offering pursuant to certain Offering Materials, including a Registration Statement,  which made similar statements.

3.      On May 7, 2019, 2U lowered the Company's revenue guidance by $13 million compared to prior guidance due to "some decline in expected graduate program enrollments."

4.      On this news, the Company's share price fell $15.16, over 25%, to close at $44.77 per share on May 8, 2019, on unusually heavy trading volume.

5.      On July 30, 2019, 2U issued a press release in which it disclosed that costs had ballooned, forcing the Company to abandon its growth plans and reducing its fiscal 2019 guidance. The Company's expected net loss for fiscal 2019 had increased by $70 million, and the reported loss would represent a 300% year-over-year increase.

6.      On this news, the Company's stock price fell $23.70, or 65%, to close at $12.80 per share on July 31, 2019, on unusually heavy trading volume.

7.      These revelations precipitated the filing of a securities class action in the United States District Court for the District of Maryland against 2U and certain of its officers and directors,

captioned *In re 2U, Inc. Securities Class Action.*, Case No. 8:19-cv-03455-TDC (the "Securities Class Action").

8.      At least half of the Company's current Board could not disinterestedly and independently respond to a litigation demand in connection with the misleading representations because, among other things, eleven of the twelve current directors are defendants in claims pursuant to Section 11 of the Securities Act of 1933, 15 U.S.C. § 77k (the "Securities Act").  Claims pursuant to Section 11 of the Securities Act do not require a showing of intent or scienter.  Accordingly, the eleven directors who are defendants in the Securities Class Action face a likelihood of liability in that action, and could not disinterestedly investigate whether their violations of Section 11 constituted breaches of fiduciary duties under Delaware law.

## II.      JURISDICTION AND VENUE

9.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 in that this Complaint states a federal question: contribution for violations of Section 10(b) of the Exchange Act of 1934.  This Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. § 1367(a).  This action is not a collusive one to confer jurisdiction on a court of the United States which it would not otherwise have.

10.      Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because a substantial portion of the transactions and wrongs complained of herein occurred in this District, and the Defendants have received substantial compensation in this district by engaging in numerous activities that had an effect in this District.

## III.      PARTIES

**Plaintiff**

11.      Plaintiff Thomas Lucey purchased shares of 2U stock in December 2016 and has continuously owned his 2U stock since that date.

**Nominal Defendant**

12.     Nominal Defendant 2U is a Delaware corporation with its principal executive offices located at 7900 Harkins Road, Lanham, Maryland 20706.  The Company stock trades on the NASDAQ exchange under the symbol "TWOU."

**Defendants**

13.     Defendant Christopher J. Paucek ("Paucek") has served as Chief Executive Officer ("CEO") and a director of the Company since October 2014.  He signed the Registration Statement and is named as a defendant in the Securities Class Action.

14.     Defendant Catherine A. Graham ("Graham") served as Chief Financial Officer ("CFO") of the Company from April 2012 to August 21, 2019.  She signed the Registration Statement and is named as a defendant in the Securities Class Action for her materially misleading statements.

15.     Defendant Harsha Mokkarala ("Mokkarala") served as Chief Marketing Officer of the Company from January 2016 to April 2018 and as Chief Revenue Officer since April 2018.  He is named as a defendant in the Securities Class Action for his materially misleading statements.

16.     Defendant Paul A. Maeder ("Maeder") has served as a director of the Company since 2010 and as Chairman of the Board since November 2012.  He signed the Registration Statement and is a defendant in the Securities Class Action.

17.     Defendant Robert M. Stavis ("Stavis") has served as a director of the Company since 2011. He is Chairman of the Audit Committee.  He signed the Registration Statement and is named as a defendant in the Securities Class Action.

18.     Defendant Gregory K. Peters ("Peters") has served as a director of the Company since March 2018. He is a member of the Audit Committee.  He signed the Registration Statement and is named as a defendant in the Securities Class Action.

4819-2304-1224, v. 3

19.     Defendant Timothy M. Haley ("Haley") has served as a director of the Company since 2010.  He signed the Registration Statement and is named as a defendant in the Securities Class Action.

20.     Defendant Valerie B. Jarrett ("Jarrett") has served as a director of the Company since December 2017.  She signed the Registration Statement and is named as a defendant in the Securities Class Action.

21.     Defendant Earl Lewis ("Lewis") has served as a director of the Company since April 2014.  He is a member of the Audit Committee.  He signed the Registration Statement and is named as a defendant in the Securities Class Action.

22.     Defendant Coretha M. Rushing ("Rushing") has served as a director of the Company since 2016.  She signed the Registration Statement and is named as a defendant in the Securities Class Action.

23.     Defendant Sallie L. Krawcheck ("Krawcheck") has served as a director of the Company since April 2014.  She signed the Registration Statement and is named as a defendant in the Securities Class Action.

24.     Defendant John M. Larson ("Larson") has served as a director of the Company since June 2009.  He signed the Registration Statement and is named as a defendant in the Securities Class Action.

25.     Defendant Edward S. Macias ("Macias") has served as a director of the Company since November 2014.  He signed the Registration Statement and is named as a defendant in the Securities Class Action.

26.     Defendant Alexis Maybank ("Maybank") has served as a director of the Company since December 2018.  She was a member of the Audit Committee from January 19, 2019 to April 25, 2019.

27.     Defendant Mark J. Chernis ("Chernis") served as a director from 2009 to May 20, 2018, when he was appointed Chief Operating Officer.  He signed the Registration Statement and is named as a defendant in the Securities Class Action.

28.     Paucek, Graham, Mokkarala, Maeder, Stavis, Peters, Haley, Jarrett, Lewis, Rushing, Krawcheck, Larson, Macias, Maybank, and Chernis are sometimes referred to hereinafter as the "Individual Defendants."

## IV.     DUTIES OF THE INDIVIDUAL DEFENDANTS

29.     By reason of their positions as officers, directors, and/or fiduciaries of 2U and because of their ability to control the business and corporate affairs of 2U, at all relevant times, the Individual Defendants owed 2U and its shareholders fiduciary obligations of good faith, loyalty, and candor, and were required to use their utmost ability to control and manage 2U in a fair, just, honest, and equitable manner.  The Individual Defendants were required to act in furtherance of the best interests of 2U and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.  Each director and officer of the Company owes to 2U and its shareholders a fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

30.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of 2U, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.  Because of their advisory, executive, managerial, and

directorial positions with 2U, each of the Individual Defendants had knowledge of material non-public information regarding the Company.

31.     To discharge their duties, the officers and directors of 2U were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the Company.  By virtue of such duties, the officers and directors of 2U were required to, among other things:

> (a)   Exercise good faith to ensure that the affairs of the Company were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of their business;
>
> (b)   Exercise good faith to ensure that the Company was operated in a diligent, honest, and prudent manner and complied with all applicable federal and state laws, rules, regulations and requirements, and all contractual obligations, including acting only within the scope of its legal authority;
>
> (c)   Exercise good faith to ensure that the Company's communications with the public and with shareholders are made with due candor in a timely and complete fashion; and
>
> (d)   When put on notice of problems with the Company's business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence.

## V.     SUBSTANTIVE ALLEGATIONS

### A.     Background

32.     2U operates a "software-as-a-service" platform, along with a suite of technology-enabled services such as coursework design and infrastructural support, to offer online degree programs in partnership with nonprofit colleges and universities.

33.     The Company derives revenue from two segments: a Graduate Program for students seeking a full graduate degree; and a Short Course for working professionals seeking advancement through skills attainment.

34.     For the Short Course program, 2U receives tuition and fees directly from the students enrolled in the courses.  The Short Course program, rebranded as the "Alternative Credential" segment, was launched in July 2017 with the acquisition of GetSmarter.  In the first six months of 2019, 2U reported a loss of $18 million, 60% of which was generated by the Short Course segment.

35.     2U generates most of its revenue from its Graduate Division.  In fiscal 2018, this segment accounted for 84.6% of the Company's revenue and 95% of its profit; in the first six months of 2019, it accounted for 80% of 2U's revenue.

36.     According to the Company, the Graduate Division partners with universities to provide online programs that result in degrees that are indistinguishable from the degree awarded to an on-campus student.  2U targets potential students and guides them through the application process, while the universities maintain full control over admissions and apply the same standards as they would for on-campus students.

37.     The Company receives a percentage of the tuition and fees, less certain charges, that university clients receive from their students in 2U-enabled programs.  However, because of the substantial investment necessary to start the program, 2U relies on long-lasting partnerships with universities to remain profitable.  Starting a program costs between $5 and $10 million per program on average, and universities commit to initial terms of 10 to 15 years.  Then, 2U continues to incur student acquisition costs, which are the most significant costs during each fiscal period, to solicit potential students throughout the life of the program.  For fiscal 2017, the Company reported total marketing and sales costs of $150.9 million, out of total costs of $316.9 million.  Marketing and sales costs include "the cost of online advertising and student generation, as well as cash and non-cash compensation and benefit costs (including stock-based compensation) for our graduate program and

short course marketing, search engine optimization, marketing analytics and admissions application counseling personnel."

38.     There is significant lag time between when the student acquisition cost is incurred and when the revenue from that student is received.  The average time between first contact and enrollment is approximately seven months.  The Company collects revenue for each student over the course of that student's enrollment, which is two years on average.  Notably, the number of students enrolled in 2U's programs is "significantly dependent" on the amount invested for student acquisition in prior periods.

**B.     The Individual Defendants Cause the Company to Issue Misleading Statements**

39.     On February 26, 2018, defendants Paucek, Graham, Mokkarala, Maeder, Stavis, Peters, Haley, Jarrett, Lewis, Rushing, Krawcheck, Larson, Macias, and Chernis caused the Company to issue a press release to announce its fourth quarter and full year 2017 financial results.  For fiscal 2018, the Company expected revenues between $397.7 million and $402.7 million and net loss between $45 million and $42.8 million.  The press release stated, in relevant part:

> "A decade into our journey, 2U is now at the forefront of the digital transformation in higher education and the strength of our business performance and the high quality student outcomes in our partner programs prove it," CEO and Co-Founder Christopher "Chip" Paucek said. "The positive momentum in our GetSmarter short course business *combined with the organic growth in our graduate program business* produced strong fourth quarter and full-year 2017 financial results and sets us up nicely for 2018."

40.     The same day, 2U held a conference call to discuss the financial results with analysts and investors.  During the call, defendant Paucek stated that 2U was operating "in a very large market that is undergoing transformation, and 2U is the company leading that transformation."  He further stated that the "power of our purpose-driven business model is evident in those results," and that the Company's success was in large part due to its having "built a ton of impressive technology across the business, and that includes the online campus we built back in 2009."  Defendant Paucek further

9

explained that 2U was insulated from competition in part because "we believe that we're the only company right now that is – that goes very deep on both depth and breadth." He also stated that 2U was in "heavy growth mode" and was successfully investing in the long-term health of the business.

41.     The above statements in ¶¶ 39-40 were materially misleading because they failed to disclose: (i) 2U's enrollment would decline in future periods, according to internal forecasts; (ii) the Company could not scale its student acquisition infrastructure efficiently and cost effectively; and (iii) as a result, the Company's business model was unsustainable to achieve the promised growth.

42.     On February 28, 2018, at the KeyBank Capital Markets Emerging Technology Summit, defendant Graham claimed that student acquisition costs were well-managed. Specifically, she stated: "[W]e manage to a ratio of lifetime revenue of a student to the total cost to acquire, and we basically manage that to about a 3.2:1 is our target ratio."

43.     The above statements in ¶ 42 were materially misleading because they failed to disclose: (i) the Company could not scale its student acquisition infrastructure efficiently and cost effectively; and (ii) as a result, the Company's business model was unsustainable to achieve the promised growth.

44.     On May 3, 2018, defendants Paucek, Graham, Mokkarala, Maeder, Stavis, Peters, Haley, Jarrett, Lewis, Rushing, Krawcheck, Larson, Macias, and Chernis caused the Company to issue a press release announcing its first quarter 2018 financial results. 2U increased its fiscal 2018 revenue guidance, expecting between $406.6 million and $410.6 million. At the same time, the Company expected greater losses than previously forecast, expecting net loss between $46.6 million and $44.7 million. The press release stated, in relevant part:

> "Our short course business has emerged as a powerful contributor to our growth story. When combined with the expected growth of our Graduate Program Segment, revenue guidance is up about $8 million over our prior guidance," said CEO and Co-Founder Christopher "Chip" Paucek. "In addition, the annual number of launched graduate

programs has increased substantially over the past few years and shows no signs of slowing down. Our pipeline also continues to be strong, giving us confidence in our revenue expectations in that core segment in future years."

45.     The same day, 2U held a conference call to discuss the financial results with analysts and investors.  During the conference call, defendant Paucek stated that 2U's "short course business is thriving," that 2U was "opening up new market channels for short courses," and that 2U had "enough confidence in the short course business to raise full year revenue guidance significantly by over $8 million."  Defendant Paucek also reaffirmed 2U's commitment to its Graduate Program approach and explained that 2U provided technology that was plainly superior to any of its competitors:

> We're pacing well ahead of last year on announcements and that's on a higher target. But even more are coming, and it's pretty fast and furious. I'm very pleased.
>
> ***Other companies in this space might like to argue they can compete, but our business model is robust for our partners and in turn for 2U.*** No other companies in the space invest like 2U. No one builds the scale like 2U. No one has a comprehensive approach to quality like 2U. We do a ton of work for our schools that others in the space simply don't and often can't do. And you don't need to take my word for it. Our clients are saying it.
>
> At Investor Day, Kent Syverud, the Chancellor of Syracuse University, stated his strong belief that Syracuse received significant value from the investments we make with the portion of the rev share the 2U takes, providing world-class technology support and care in areas that the university shouldn't really be focused on. And in doing so, we drive incredible student outcomes. But financial sustainability is also critical. ***Our long-term relationships, which are really like partnerships expressed through a revenue share, are producing a powerful business model for our partners that they simply can't find elsewhere.***

46.     During the same call, defendant Graham proclaimed that 2U was the educational version of "Amazon" and stated that the Company was "reinvesting to take advantage of momentum." Moreover, when asked whether 2U gained significant efficiencies as a result of growing its scale, defendant Paucek: "I would argue that sort of overall ecosystem that we operate now is at scale. ***And we're seeing real benefit from that***."

11

47.    The above statements in ¶¶ 44-46 were materially misleading because they failed to disclose: (i) 2U's enrollment would decline in future periods, according to internal forecasts; (ii) the Company could not scale its student acquisition infrastructure efficiently and cost effectively; and (iii) as a result, the Company's business model was unsustainable to achieve the promised growth.

**C.    The Individual Defendants Caused the Company to Issue Materially Misleading Offering Materials**

48.    On May 21, 2018 and on May 23, 2018, defendants Paucek, Graham, Maeder, Stavis, Peters, Haley, Jarrett, Lewis, Rushing, Krawcheck, Larson, Macias, and Chernis caused 2U to file a Preliminary Prospectus Supplement and Prospectus Supplement, respectively (the "Prospectus Supplement").  The Prospectus Supplement consists of two parts, the Prospectus Supplement and a Prospectus dated September 23, 2015, and incorporated by reference certain additional documents. The Prospectus Supplement and Prospectus comprised part of a Registration Statement.   The Registration Statement and documents incorporated therein by referenced are collectively referred to herein as the "Offering Materials."

49.    The Registration Statement was signed by defendants Paucek, Graham, Maeder, Stavis, Peters, Haley, Jarrett, Lewis, Rushing, Krawcheck, Larson, Macias, and Chernis.  Pursuant to the Registration Statement and other Offering Materials, 2U completed a secondary public offering ("SPO") on May 25, 2018, issuing $300 million worth of shares.

50.    The Offering Materials incorporated by reference the Form 10-K for the fiscal year ended December 31, 2017, which had been filed with the SEC on February 27, 2018 ("2017 10-K"). The 2017 10-K was signed by Paucek, Graham, Maeder, Stavis, Peters, Haley, Jarrett, Lewis, Rushing, Krawcheck, Larson, Macias, and Chernis.  According to the 2017 10-K, 2U's growth strategy was "to add graduate programs and short courses with new and existing university clients, and increase student enrollments across our entire portfolio of offerings."  It pointed to the Company's

4819-2304-1224, v. 3

rapid growth from its founding in 2008, stating "from one client with one program in one academic discipline in 2008 to 24 clients with 51 programs in 23 degree verticals today, 37 of which have launched and have students enrolled. A full listing of all 51 announced programs, including the programs we plan to launch in 2018, can be found at investor.2u.com."

51.    The 2017 10-K also stated that 2U had improved its capabilities for student acquisition, which led to increased demand and increased growth:

> Over the past decade, we have developed new and innovative tools within our platform to enhance the effectiveness of instructional methods and improve student outcomes and the student experience. ***During that time, we have also refined our program selection algorithm and improved our data-driven digital marketing capabilities across our ecosystem of offerings to generate increased student enrollments in a cost effective manner.*** As a result, demand for our comprehensive platform of integrated technology and services has increased significantly. ***Since 2008, we have expanded our university client base from one to 24 across our entire portfolio of offerings, increased the number of 2U-powered graduate programs from one to 37, and enrolled over 33,000 graduate students.***

52.    The 2017 10-K also stated, regarding student acquisition:

> *Student Acquisition.* ***Leveraging data analytics and machine learning techniques, we develop targeted, offering-specific digital marketing campaigns that can reach and engage interested and qualified prospective students in a cost-effective manner.*** Our marketing teams also develop creative assets, such as websites related to the graduate program and short course fields of study, and execute search engine optimization and paid search campaigns aimed at acquiring students cost-effectively.

53.    The above statements in ¶¶ 50-52 were materially misleading because they failed to disclose that, at the time of the SPO: (i) 2U's enrollment would decline in future periods, according to internal forecasts; (ii) the Company's growth was unsustainable because it could not scale its student acquisition infrastructure efficiently or cost effectively.

54.    According to the 2017 10-K, 2U was well-positioned to "compete favorably," as "the market for online education offerings at nonprofit institutions matures" because of the Company's "expertise in marketing, student acquisition and student retention," among other factors.

55.     The above statements in ¶ 54 were materially misleading because they failed to disclose that, at the time of the SPO: (i) 2U's enrollment had been declining since 2017 and would continue to deteriorate in 2018, according to internal forecasts; (ii) the Company's marketing and student acquisition efforts could not keep pace with the Company's increasing number of programs; (iii) 2U's business model was unsustainable in an increasingly competitive market; (iv) the Company was losing students to competing programs; and (v) as a result of the foregoing, 2U was unlikely to "compete favorably" in the market.

56.     Moreover, the 2017 10-K identified the following risk impacting its growth:

> We have grown rapidly and expect to continue to invest in our growth for the foreseeable future. If we fail to manage this growth effectively, the success of our business model will be compromised.

> We have experienced rapid growth in a relatively short period of time, which has placed, and will continue to place, a significant strain on our administrative and operational infrastructure, facilities and other resources. Our ability to manage our operations and growth will require us to continue to expand our marketing and sales personnel, technology team, finance and administration teams, as well as our facilities and infrastructure. We will also be required to refine our operational, financial and management controls and reporting systems and procedures. *If we fail to manage this expansion of our business efficiently, our costs and expenses may increase more than we plan and we may not successfully* expand our university client base, enhance our platform, develop new offerings with new and existing university clients, *attract a sufficient number of qualified students in a cost-effective manner*, satisfy the requirements of our existing university clients, *respond to competitive challenges or otherwise execute our business plan*. Accordingly, our historical revenue growth rate may not continue in the future.

57.     The above statements in ¶ 56 were materially misleading because they failed to disclose that, at the time of the SPO, this risk had already materialized.  Specifically, it failed to disclose that: (i) 2U's enrollment had been declining since 2017 and would continue to deteriorate in 2018, according to internal forecasts; (ii) the Company's marketing and student acquisition efforts could not keep pace with the Company's increasing number of programs; (iii) 2U's business model was unsustainable in an increasingly competitive market; (iv) the Company was losing students to

14

competing programs; and (v) as a result of the foregoing, 2U was unlikely to "compete favorably" in the market.

**D.      The Individual Defendants Cause the Company to Continue to Issue Materially Misleading Statements**

58.      On June 5, 2018, at the Robert W. Baird & Co. Global Consumer, Technology & Services Conference, defendant Mokkarala touted 2U's marketing capabilities, stating: The Company uses "the best-in-class in terms of digital marketing, data and analytics, machine learning, AI, all these tools to find the most qualified prospective students in a sustainable manner at scales that have never been seen in higher ed before."

59.      Defendant Mokkarala continued:

It's really a needle in a haystack. There is a small community of people who are interested in this and *finding these people and making sure we are supporting them through the process of both becoming a student*, as well as graduating from these programs, *is really what we bring to the table*. And data and analytics are a key guide to getting that right.

*And we are able to find these audiences at scale with bespoke campaigns and spend for each university program.* Like I said, all of our marketing is directed at specific brands, specific universities. The fact that we're able to do this at scale across lots of verticals and lots of programs within each of those verticals -- we define a vertical as business is a vertical, law is a vertical, [indiscernible] subject area. The fact that *we are able to do this across verticals and with lots of programs with no verticals* helps us create a certain amount of leverage and a network effect that is super important.

\*      \*      \*

*Another thing that we bring that is unique to the table is multiprogram verticals.* This is the notion of doing multiple programs within a given vertical. We power 12 different MBAs across the country and now 1 in the United Kingdom with University College London. And each of these gives us an opportunity to build a custom higher education audience and leverage it in the sense that we gather a ton of data on sort of what this market looks like and the ability to apply that data that we gather across this network to the betterment of each of these individual programs. That means finding more students for each of these programs and improving the efficiency, which means you can do more of it. It's super, super critical. . . . *So multi-program verticals are a great way for us to grow the pie overall both for individual program as well as for the network*.

60.     The above statements in ¶¶ 58-59 were materially misleading because they failed to disclose: (i) 2U's enrollment would decline in future periods, according to internal forecasts; (ii) the Company could not scale its student acquisition infrastructure efficiently and cost effectively; and (iii) as a result, the Company's business model was unsustainable to achieve the promised growth.

61.     On June 19, 2018, Spruce Point Capital Management, LLC ("Spruce Point") issued a report, arguing that 2U's programs were underperforming, including "eight of the 14 programs launched between 2013 and 2015," and four of the top seven programs which had reached peak or declining enrollments.  The report also challenged several aspects of 2U's business model, claiming that several underlying problems would adversely impact its growth expectations, including: (a) that declining tuition costs in competing programs would put pressure on tuition for 2U's programs, thereby undercutting the Company's assumption that it will reach steady state revenues of $16 million per program; (b) that competition for students was increasing among the various online programs, pressuring margins because 2U would be required to increase its student acquisition costs; (c) that the Company had acquired GetSmarter in May 2017 to conceal slowing growth domestically; and (d) 2U's SPO noted the possibility of potential future acquisitions, which raised concerns about the Company's organic growth prospects.

62.     But the Individual Defendants denied the allegations.  On August 2, 2018, defendants Paucek, Graham, Mokkarala, Maeder, Stavis, Peters, Haley, Jarrett, Lewis, Rushing, Krawcheck, Larson, Macias, and Chernis caused the Company to issue a press release announcing its second quarter 2018 financial results.  Therein, 2U increased its revenue guidance for fiscal 2018, expecting between $409.7 million and $412.2 million, and lowered the expected loss to a range of $42.7 million to $41.5 million.  The press release stated, in relevant part:

> "In the three months since our last earnings report, we've announced a total of eight new graduate programs, putting us on pace to complete our 2019 launch cohort this

quarter, the earliest in 2U's history" said CEO and Co-Founder Christopher "Chip" Paucek. "Ten years in, we have a proven and unparalleled track record of delivering for our partners and their students, which continues to drive exceptional momentum in both degree and short course pipeline as well as long-term contract extensions by existing clients."

63.     The same day, the Company held a conference call to discuss the financial results with analysts and investors.  In an apparent reference to the Spruce Point report, defendant Paucek stated: "Don't let the skeptic win. . . . 2U is creating a long-term sustainable engine of social mobility.  We're doing it with a shared success model.  When students win, the university wins, and that's how we win."  Indeed, purportedly underscoring the success of the model, defendant Paucek raised the "full year revenue guidance this quarter by over $2 million.  At the midpoint of the new range, we expect year-over-year revenue growth of 43%."

64.     Defendant Paucek reaffirmed 2U's commitment to its high-growth business model, stating that he was "confident in the reacceleration over the next few years: enrollments and pipeline," and that 2U was well-positioned because of its superior technology over competitors. He also stated that 2U was "scaling it at quality" and "2U has a track record of scaling enrollments that's better than anyone in the space."

65.     Moreover, defendant Paucek assured that the Company's "marketing has gotten more efficient. We don't have a marketing efficiency problem."  Similarly, when asked whether the cost to acquire students was rising, he stated that, "as we get greater scale, we are able to be more effective there, not less."  Defendant Paucek further stated:

> *And so what has happened as of late is we are starting to see contracts come to us either from schools that were running them themselves or from competitors. This is now becoming a thing, and certainly, we like it.* But once again, I would emphasize that, regardless of the sort of notion of the competition ultimately, when we power a program, we scale it, and we do it equality.
>
> *So it's not just about being big, it's being good. And we do both. And to do that, you have to invest. And we invest heavily in this full system, that I just don't think*

***anybody is close to comparable.*** So net-net, we feel really good about our competitive position.

*      *      *

***Now we happen to think that this model provides long-term sustainability.*** We think it provides a program that runs sufficiently on its own, not being subsidized either by the campus program or by an outside entity of some kind. ***And so we do indeed like our model.***

66.     Moreover, defendant Paucek dismissed concerns about 2U's organic growth.   He stated that domestic graduate programs ("DGPs") were the "organic growth engine" of 2U, stating:

> We recently updated our long-term DGP target to 250 programs. ***But the important part is what that 250 number represents, somewhere around 80,000 to 85,000 conferrals per year.*** To set the stage, there are thousands of college and universities in the United States, and the Department of Ed identifies over 1,700 verticals. There's obviously a lot of program options. It's early days.

67.     The above statements in ¶¶ 62-66 were materially misleading because they failed to disclose: (i) 2U's enrollment would decline in future periods, according to internal forecasts; (ii) the Company could not scale its student acquisition infrastructure efficiently and cost effectively; and (iii) as a result, the Company's business model was unsustainable to achieve the promised growth.

68.     On September 13, 2018, at the BMO Capital Markets Back to School Conference, defendant Paucek reiterated:

> One of the parts of the most recent [short] report that was the most untrue is that we weren't – we've not been able to maintain our economies and that somehow the world will come crashing down. ***Sorry, it's just not accurate.*** We've done a good job convincing our partners that we're creating newer schools, that we're creating value. Well, how do we do that? We're showing them the value that's been created from the older schools.

69.     The above statements in ¶ 68 were materially misleading because they failed to disclose: (i) 2U's enrollment would decline in future periods, according to internal forecasts; (ii) the Company could not scale its student acquisition infrastructure efficiently and cost effectively; and (iii) as a result, the Company's business model was unsustainable to achieve the promised growth.

18

70.    On November 5, 2018, defendant Paucek, Graham, Mokkarala, Maeder, Stavis, Peters, Haley, Jarrett, Lewis, Rushing, Krawcheck, Larson, Macias, and Chernis caused the Company to issue a press release announcing its third quarter 2018 financial results and revised guidance for fiscal 2018.  The press release stated, in relevant part:

> "***Strong year-over-year growth combined with our stepped-up program launch targets for 2019, 2020 and 2021, have put 2U on the path to $1.0 billion in revenue, which we expect to hit in a little over three years***," Co-Founder and CEO Christopher "Chip" Paucek said. "Higher education is fully embracing the power of online, and 2U's size, scale and track record put us in the pole position to seize new growth opportunities and further solidify our market leadership globally."

*       *       *

**Financial Outlook**

Based on information available as of today, 2U is issuing the following guidance for fourth quarter and full-year of 2018. This guidance assumes foreign exchange rates as of September 30, 2018, including 14.14 for U.S. dollar/South African rand and 0.7675 for the U.S. dollar/British pound.

|  | 4Q 2018 | FY 2018 |
| --- | --- | --- |
|  | (in millions, except per share amounts) | |
| Revenue | $114.4 - $115.3 | $411.0 - $411.9 |
| Net income (loss) | $2.4 - $3.0 | $(40.7) - $(40.1) |
| Net income (loss) per share, basic | - | $(0.73) - $(0.72) |
| Net income (loss) per share, diluted | $0.04 - $0.05 | - |
| Adjusted net income (loss) | $12.3 - $12.9 | $(4.9) - $(4.3) |
| Adjusted net income (loss) per share, basic | - | $(0.09) - $(0.08) |
| Adjusted net income (loss) per share, diluted | $0.20 - $0.21 | - |
| Weighted-average shares of common stock outstanding, basic | 57.9 | 55.9 |
| Weighted-average shares of common stock outstanding, diluted | 61.9 | - |
| Adjusted EBITDA | $19.8 - $20.4 | $17.4 - $18.0 |
| Stock-based compensation expense | $8.7 - $8.9 | $32.8 - $33.0 |

71.    The same day, 2U held a conference call to discuss the financial results with analysts and investors.  During the call, defendant Paucek claimed that 2U would continue to grow as the Company invested in expanding 2U's university partners, developing new content, and attracting students.  Defendant Paucek stated:

Now looking ahead to 2019. We're expecting consolidated revenue growth of 33.2% at the midpoint of our range. ***We're pleased with the resiliency of our grad portfolio and the power of our short course business, resulting in the type of expected growth that puts us in rarefied air among software companies. Look, it isn't common that a company keeps growing north of 30% off of a base of over $400 million in revenue.*** We said in the past that we expect to keep revenue growth above 30% for the "foreseeable future". We're now confident enough in the overall portfolio and the strength of the pipeline to put a timeline on it. ***We think we can keep consolidated revenue growth above 30% for at least the next 5 years. Based on these current growth expectations, 2U expects to hit $1 billion in revenue in a little over 3 years.*** That used to be a long-range goal. Now it's right in front of us. We can see it. You'll hear more about the path to $1 billion in the coming quarters.

*       *       *

We signed all of the programs for our initial 2019 target much earlier than for previous years. And due to the strength of the pipeline, we increased our annual launch targets for the next 3 years. ***Competition is and always will be relevant, but we believe increased adoption is an opportunity for us, not a challenge. We're winning. Higher education as a whole is fully embracing online education. They're realizing this is something they need to do and do it soon.*** Our current partners are asking us for more, and it's clear to me, we need to be in a position to say yes.

72.     Defendant Graham also noted the additional spend on marketing to drive enrollment.

She stated:

I'd like to point out that the 2019 margin declines we expect to incur to fund additional investments in marketing, and to a lesser extent, in technology improvements and content scaling, represent only a small portion of the year-over-year revenue growth we expect to generate in 2019.

At the midpoint to the full year revenue and adjusted EBITDA ranges we've provided, it implies that we will invest only slightly more than 6.5% of our expected 2019 year-over-year revenue increase in rightsizing our marketing spend, making a significant technology transition, matching course production to our increasing launch cadence and driving continued growth in quality in years to come.

***I'll also note that these additional expenditures have no impact on our belief that our current business plan is fully funded.***

*       *       *

***I want to reiterate that nothing about what we're talking about in terms of margins or in terms of additional investment in 2019 in any way has us believe that we're not fully funded*** through self-sustaining on our current business model.

20

73.     The above statements in ¶¶ 70-72 were materially misleading because they failed to disclose: (i) 2U's enrollment would decline in future periods, according to internal forecasts; (ii) the Company could not scale its student acquisition infrastructure efficiently and cost effectively; and (iii) as a result, the Company's business model was unsustainable to achieve the promised growth.

74.     On February 25, 2019, the Individual Defendants caused the Company to issue a press release announcing its fourth quarter and full year 2018 financial results, as well as guidance for fiscal 2019.  The press release stated, in relevant part:

> "The strength and resilience of 2U's business is clear from our 2018 fourth quarter and full-year results, and reflects the continued expansion and increasing diversity of our degree and short course portfolios, both domestically and internationally," Co-Founder and CEO Christopher "Chip" Paucek said. "Our commitment to investing in sustained growth not only sets 2U apart in the education technology industry, but will allow us to better meet the evolving needs of our partners and the marketplace."

> \*       \*       \*

> **Financial Outlook**

> Based on information available as of today, 2U is issuing the following guidance for first quarter and full-year of 2019. This guidance assumes foreign exchange rates as of December 31, 2018 for the U.S. dollar/South African rand and the U.S. dollar/British pound.

| | 1Q 2019 | FY 2019 |
|---|---|---|
| | (in millions, except per share amounts) | |
| Revenue | $121.5 - $122.1 | $546.6 - $550.8 |
| Net loss | $(22.0) - $(21.6) | $(80.2) - $(77.8) |
| Net loss per share | $(0.38) - $(0.37) | $(1.37) - $(1.33) |
| Adjusted net loss | $(10.8) - $(10.4) | $(21.8) - $(19.4) |
| Adjusted net loss per share | $(0.19) - $(0.18) | $(0.37) - $(0.33) |
| Weighted-average shares of common stock outstanding, basic | 58.2 | 58.7 |
| Adjusted EBITDA (loss) | $(4.6) - $(4.2) | $11.8 - $14.2 |
| Stock-based compensation expense | $10.0 - $10.2 | $53.7 - $54.1 |

75.     The same day, 2U held a conference call to discuss the financial results with analysts and investors.  During the call, defendant Paucek affirmed that "[2U's] business is resilient, it's diversified, and it's growing."  He also reaffirmed that "the company is fully funded," and defendant

Graham explained that the Company's revenue was on track to further grow, from $411.8 million in fiscal 2018 to $546.6 to $550.8 million in fiscal 2019.

76.     Defendant Paucek added:

> ***Our diversified grad portfolio is strong.*** You can see the power of the portfolio at work in the additional disclosures we shared at the end of the year, including our cohort margins and our list of grad programs by annual new student enrollment. Both can be found in our earnings deck. Cathy will address cohort margins in her section. I'll cover the list of top grad programs by annual new student enrollment now.
>
> As we did last year, we've again expanded the list by 5 spots, this time from 15 programs to 20 programs. We believe the expanded list better demonstrates the progress of our newer programs and the strength of the overall portfolio. While we don't give the exact enrollment numbers, that's the partners' call, I can share that the entire top 20 is above 200 new student enrollments and so are some of the programs outside of the top 20. Notably, there's a program from every single cohort in the top 20. Mature programs continue to enroll new students. ***Newer programs are scaling well***, and the 2018 cohort continues to be excellent. In fact, 7 programs on the list were launched in the past 2 years. Let that land for a second. 7. So much for the theory that all of the new ones will be small and suboptimal.
>
> We're not only seeing strength across our cohorts, but across verticals. There are 10 verticals represented on the list. 10. It's also across geographies. There are programs from every major region of the U.S. We told you verticals matter and geography matters. ***Our . . . expanding selection of programs continues to drive growth in the grad segment.***
>
>                             \*       \*       \*
>
> This is my 5th year as a public company CEO. I can easily say last quarter was the most complicated we had. ***It was a whirlwind. But this whirlwind was not related to fundamental issues with our business model or overstated fears of competitive pressures.***

77.     Defendant Graham similarly pointed to "higher margin[s]" in more mature cohorts as a "significant part of our decision to expand marketing spend and take somewhat lower margins for 2019 to attract additional students and drive additional revenue."  She further stated that historical data and industry trends "validate[d]" the growth strategy, stating in relevant part:

> ***What we're seeing now across all our program cohorts strongly validates the typical program economic life cycle we've consistently discussed with you and makes us***

4819-2304-1224, v. 3

*very comfortable that to drive growth, increasing our investments in both new program launches and current program marketing are wise strategic decisions.*

\*       \*       \*

But despite that cautionary note, we remain excited and energized by the opportunity we have in front of us, not only for 2019 but beyond. Our revenue and adjusted earnings measure expectations for the year are up, but more importantly, *we remain confident in our ability to continue delivering 30%-plus top line growth, get to $1 billion in revenue within 3 years and leverage a business model that we've proven can deliver profitability as programs mature.*

\*       \*       \*

So kind of what we have said is that you shouldn't think of this as being a continual degradation of margins on a year-over-year and continuing basis. This is kind of getting us back onto the right glide path from where such a number of our programs should be. And I can't tell you, at this point, whether 2020 will sort of flatten out in margin or step up a little. But over time, I would say that our intention is to return to the kind of patterns that we had been seeing, which is you will see slow and – slow but perhaps steady increases in margin over time as we move towards steady state. *You should keep in mind that for us, margins are, in many ways, a matter of choice as to how much investment we're making in growth, and I just want you guys to remember that, that this is very much within our control based on how quickly we decide to grow and what opportunities there are in front of us.*

78.     The above statements in ¶¶ 74-77 were materially misleading because they failed to disclose: (i) 2U's enrollment would decline in future periods, according to internal forecasts; (ii) the Company could not scale its student acquisition infrastructure efficiently and cost effectively; and (iii) as a result, the Company's business model was unsustainable to achieve the promised growth.

79.     On April 8, 2019, the Individual Defendants caused 2U to announce that it would acquire Trilogy, an adult focused online educational company, for $750 million in cash and stock. In connection with the announcement, defendant Paucek represented: "We expect the addition of Trilogy to accelerate our path to $1 billion in revenue by one year from 2022 to 2021 . . . ."

E.      **The Truth Begins to Emerge**

80.      On May 7, 2019, 2U reported disappointing first quarter 2019 financial results and lowered the Company's revenue guidance by $13 million compared to prior guidance.  The press release stated, in pertinent part:

**Financial Outlook**

Based on information available as of today, 2U is issuing the following guidance for second quarter and full-year of 2019. This guidance assumes foreign currency exchange rates as of March 31, 2019 for the U.S. dollar/South African rand and the U.S. dollar/British pound. . . .

|  | 2Q 2019 | FY 2019 |
| --- | --- | --- |
|  | (in millions, except per share amounts) | |
| Revenue | $124.3 - $125.0 | $534.0 - $537.0 |
| Net loss | $(36.0) - $(35.5) | $(79.0) - $(77.2) |
| Net loss per share | $(0.61) - $(0.60) | $(1.35) - $(1.32) |
| Adjusted net loss | $(20.8) - $(20.3) | $(20.0) - $(18.2) |
| Adjusted net loss per share | $(0.36) - $(0.35) | $(0.34) - $(0.31) |
| Weighted-average shares of common stock outstanding, basic | 58.6 | 58.7 |
| Adjusted EBITDA (loss) | $(13.1) - $(12.6) | $12.5 - $14.3 |
| Stock-based compensation expense | $14.0 - $14.2 | $52.2 - $52.6 |

2U expects that of the revenue it recognizes in the second half of 2019, approximately 48% will be recognized in the third quarter.

Note that 2U's previously announced intention to increase marketing spend in the first half of 2019 is reflected in this guidance and has the effect of driving larger second quarter losses than would be expected under typical performance patterns.

Further note that cost seasonality in the second and fourth quarters typically reduces margins in the first half of each year and improves margins in the second half of each year, so second-half margins should not be viewed as being a run rate for the first half of the following year.

81.      The same day, 2U held a conference call during defendant Paucek acknowledged that he should have "taken some air out of the balloon" on 2U's growth story.  Defendant Graham attributed the lowered revenue guidance to "some decline in expected graduate program enrollments beginning in the second quarter and continuing through the rest of the year."

82.    On this news, the Company's share price fell $15.16, over 25%, to close at $44.77 per share on May 8, 2019, on unusually heavy trading volume.

83.    However, during the same call, defendant Paucek assured that "2U is still very much a growth story" and that he saw no "challenges . . . attributable to weakness in [the Company's] efficiency at the top of the funnel."  Rather, he explained the declining enrollment was caused by three factors, purportedly beyond the Company's control:

> Number one, our partners are getting more selective, which impacts admit rate; number two, we're seeing more pressure mid-funnel on the rate at which prospective students are submitting their applications for review; and number three, we're seeing some slowness in the 2019 cohort, most importantly, one of our largest projected programs for the 2019 cohort had its launch date slip to later in the year for reasons beyond the control of the school and 2U.

84.    He also stated that the Company "continue[s] to see programs across the portfolio scale toward our target ranges for new student enrollments.  We still firmly believe in our runway of 250 DGPs.  Pipeline for those programs is strong."  Defendant Paucek also reiterated that "we aren't seeing any declines in front-end marketing efficiency."

85.    On July 30, 2019, 2U issued a press release in which it disclosed that costs had ballooned, forcing the Company to abandon its growth plans and reducing its fiscal 2019 guidance. The Company's expected net loss for fiscal 2019 had increased by $70 million and would represent a 300% year-over-year increase.  The press release stated, in relevant part:

> "With the close of our Trilogy acquisition, 2U's business is evolving to better meet marketplace demand and the transforming needs of our university partners and lifelong learners," Co-Founder and CEO Christopher "Chip" Paucek said. "As we deliver our full portfolio of educational offerings to new and existing partners, we are also setting 2U on a defined path to profitability by tempering short-term growth projections and leveraging our scale to drive greater operational efficiencies across the business."

*      *      *

**Financial Outlook**

Based on information available as of today, 2U is issuing the following guidance for the third quarter and full-year of 2019. This guidance assumes foreign currency exchange rates as of June 30, 2019 remain constant, including the U.S. dollar/South African rand and the U.S. dollar/British pound.

| | 3Q 2019 | FY 2019 |
|---|---|---|
| | (in millions, except per share amounts) | |
| Revenue | $147.6 - $152.6 | $565.7 - $575.7 |
| Net loss | $(69.3) - $(66.3) | $(157.5) - $(151.5) |
| Net loss per share | $(1.10) - $(1.05) | $(2.57) - $(2.47) |
| Adjusted net loss | $(33.8) - $(30.8) | $(76.9) - $(70.9) |
| Adjusted net loss per share | $(0.53) - $(0.49) | $(1.25) - $(1.16) |
| Weighted-average shares of common stock outstanding, basic | 63.2 | 61.3 |
| Adjusted EBITDA (loss) | $(18.4) - $(15.4) | $(28.0) - $(22.0) |
| Stock-based compensation expense | $18.9 - $19.9 | $56.0 - $58.0 |

The revenue reflected in this guidance includes a deferred revenue fair value purchase accounting adjustment related to the Trilogy acquisition. Adding back revenue eliminated as a part of purchase accounting, our revenue guidance ranges would be $153.6 million to $158.6 million and $576.9 million to $586.9 million for the third quarter and full year, respectively.

In giving third quarter and full-year guidance, the Company's expectations for the fourth quarter are implied. Note that the cost seasonality driven by reduced marketing spend during the holiday period in the fourth quarter typically improves margins in that quarter; fourth quarter margins therefore should not be viewed as a run rate for the first quarter of the following year.

86.    The same day, 2U held a conference call to discuss these financial results with analysts and investors.  During the call, the Company "moderat[ed its] outlook for the business in the short term."  Specifically, "[e]xcluding the expected financial impact of Trilogy, ***this implies a step down in revenue expectations for the rest of the business***."  Moreover, to compete in an increasingly saturated online education market, 2U would undergo substantial adjustment.  Defendant Paucek stated:

Today, the online education market is evolving. Secular forces are pushing more schools online. Indeed, it's becoming obvious that all schools are going online. We're

26

calling it the mainstreaming of online education. ***We believe this represents a new reality in the marketplace and requires us and others to adjust to it.*** We also believe that this new reality is one that 2U is uniquely positioned to benefit from due to our size and comprehensive product set. So we're adjusting our executional model against the dynamic of this mainstreaming of online education in a way that meets this new market dynamic.

Competition for students has increased. Programs will be slightly smaller than they were in the past, but the scale benefits of 2U's overall operating model, a combination of 2UOS and products across the career curriculum continuum become even more important as more schools come online.

87.     On this news, the Company's stock price fell $23.70, or 65%, to close at $12.80 per share on July 31, 2019, on unusually heavy trading volume.

> **F.     Defendants Paucek, Haley, and Lewis Sold Nearly $27 Million in 2U Stock While in Possession of Material Non-Public Information**

Paucek

88.     Defendant Paucek was CEO and a director and, as set forth herein, possessed material non-public information regarding 2U's business condition and model.  Defendant Paucek consciously acted to exploit his knowledge by selling over $22 million of 2U stock to his substantial benefit, as follows:

| Date | Shares Sold | Price | Proceeds |
|---|---|---|---|
| 04/16/2018 | 193,544 | $82.72 | $16,010,408 |
| 09/10/2018 | 75,000 | $84.42 | $6,331,710 |
| | **268,544** | | **$22,342,118** |

89.     Defendant Paucek thus used his fiduciary position to enrich himself and failed to discharge his duties by causing the Company to candidly reveal the truth about the business condition.

Haley

90.     Defendant Haley was a director and, as set forth herein, possessed material nonpublic information regarding 2U's business condition and model.  Defendant Haley consciously acted to exploit his knowledge by selling nearly $4 million of 2U stock to his substantial benefit, as follows:

27

| Date | Shares Sold | Price | Proceeds |
|------|-------------|-------|----------|
| 03/07/2018 | 45,000 | $88.67 | $3,990,000 |
| | **45,000** | | **$3,990,000** |

91.     Defendant Haley thus used his fiduciary position to enrich himself and failed to discharge his duties by causing the Company to candidly reveal the truth about the business condition.

Lewis

92.     Defendant Lewis was a director and, as set forth herein, possessed material nonpublic information regarding 2U's business model and condition.  Defendant Lewis consciously acted to exploit his knowledge by selling nearly $1 million of 2U stock to his substantial benefit, as follows:

| Date | Shares Sold | Price | Proceeds |
|------|-------------|-------|----------|
| 06/14/2018 | 10,393 | $95.74 | $995,026 |
| | **10,393** | | **$995,026** |

93.     Defendant Lewis thus used his fiduciary position to enrich himself and failed to discharge his duties by causing the Company to candidly reveal the truth about the business condition.

## VI.    DAMAGES TO THE COMPANY

94.     As a direct and proximate result of the Individual Defendants' conduct, 2U has been seriously harmed and will continue to be. Such harm includes, but is not limited to:

a)      Legal fees incurred in connection with the Securities Class Action;

b)      Any funds paid to settle the Securities Class Action; and

c)      Costs incurred from compensation and benefits paid to the defendants who have breached their duties to 2U.

95.     In addition, 2U's business, goodwill, and reputation with its business partners, regulators, and shareholders have been gravely impaired.  The Company still has not fully admitted the nature of its false statements and the true condition of its business.  The credibility and motives of management are now in serious doubt.

28

4819-2304-1224, v. 3

96.     The actions complained of herein have irreparably damaged 2U's corporate image and goodwill.  For at least the foreseeable future, 2U will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior and have misled the investing public, such that 2U's ability to raise equity capital or debt on favorable terms in the future is now impaired.

## VII.    DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

97.     Plaintiff brings this action derivatively in the right and for the benefit of 2U to redress injuries suffered, and to be suffered, by 2U as a direct result of breaches of fiduciary duty by the Individual Defendants, contribution for violations of Section 10(b) of the Exchange Act, and insider trading (i.e. *Brophy* claim).  2U is named as a nominal defendant solely in a derivative capacity.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

98.     Plaintiff will adequately and fairly represent the interests of 2U in enforcing and prosecuting its rights.

99.     Plaintiff has continuously been a shareholder of 2U at times relevant to the wrongdoing complained of and is a current 2U shareholder.

100.     When this action was filed, 2U's Board of Directors consisted of defendants Paucek, Maeder, Stavis, Peters, Haley, Jarrett, Lewis, Rushing, Krawcheck, Larson, Macias, and Maybank. Plaintiff did not make any demand on the Board to institute this action because such a demand would be a futile, wasteful, and useless act, as set forth below.

**Defendant Paucek**

101.     Paucek serves as 2U's CEO, and therefore is not independent under NYSE listing rules.  As an employee, Paucek derives substantially all of his income from his employment with 2U, thus could not disinterestedly consider a demand for action that might require him to sue the directors that control his continued employment and/or fellow members of management with whom he works

29

on a day-to-day basis.  Paucek personally issued the misleading statements alleged herein.  As a result, Paucek would be interested in a demand regarding his own wrongdoing, and demand is futile as to him.

**Defendants Stavis, Peters, Lewis, and Maybank**

102.     Stavis, Peters, Lewis, and Maybank served as the members of the Audit Committee at relevant times.  As such, they are responsible for the effectiveness of the Company's internal controls, the integrity of its financial statements, and its compliance with laws and regulations.   In their capacities as Audit Committee members, Stavis, Peters, Lewis, and Maybank reviewed and approved the disclosures regarding the Company's student acquisition costs and enrollment numbers.  As alleged herein, Stavis, Peters, Lewis, and Maybank failed to ensure the integrity of the Company's internal controls, allowing the materially misleading statements to be disseminated in 2U's SEC filings and other disclosures.  Thus, Stavis, Peters, Lewis, and Maybank breached their fiduciary duties and are not disinterested, and demand is excused as to them.

**Defendants Paucek, Maeder, Stavis, Peters, Haley, Jarrett, Lewis, Rushing, Krawcheck, Larson, and Macias**

103.     Paucek, Maeder, Stavis, Peters, Haley, Jarrett, Lewis, Rushing, Krawcheck, Larson, and Macias served on the Board before the Company's SPO and knew of the material adverse trends impacting the Company's Graduate Division, which accounted for the majority of 2U's revenues and profits.  They signed the Registration Statement and 2017 10-K and knew that these documents omitted these material adverse trends.  As a result, Paucek, Maeder, Stavis, Peters, Haley, Jarrett, Lewis, Rushing, Krawcheck, Larson, and Macias are defendants in the Securities Class Action and face a substantial risk of liability.  As such, they are not disinterested, and demand is excused as to them.

4819-2304-1224, v. 3

104.    Demand is also excused as to Paucek, Maeder, Stavis, Peters, Haley, Jarrett, Lewis, Rushing, Krawcheck, Larson, and Macias because they permitted the pervasive issuance of misleading statements regarding 2U's core business.  In the discharge of their obligations as directors, Paucek, Maeder, Stavis, Peters, Haley, Jarrett, Lewis, Rushing, Krawcheck, Larson, and Macias were required to, and did, inform themselves of material business trends regarding 2U's core operations and business.  They nevertheless permitted the Company to misrepresent the state of 2U's business, knowing that the Company's public representations were not accurate.  As a result, Paucek, Maeder, Stavis, Peters, Haley, Jarrett, Lewis, Rushing, Krawcheck, Larson, and Macias face a substantial likelihood of liability and could not disinterestedly consider a demand for action.

**Defendants Paucek, Maeder, Stavis, Peters, Haley, Jarrett, Lewis, Rushing, Krawcheck, Larson, Macias, and Maybank**

105.    Demand is also excused as to the *Brophy* claim against defendants Paucek, Haley, and Lewis for similar reasons.  Defendants Maeder, Stavis, Peters, Jarrett, Lewis, Rushing, Krawcheck, Larson, Macias, and Maybank could not disinterestedly consider a demand to investigate and take action in connection with the improper insider selling of Paucek, Haley, and Lewis because were they to conclude that Paucek, Haley, and Lewis had sold 2U stock while in possession of undisclosed, material, negative information about 2U's stock, they would be conceding that material negative information was undisclosed related to 2U's core business.  As directors of a corporation operating in a highly regulated industry, Maeder, Stavis, Peters, Jarrett, Lewis, Rushing, Krawcheck, Larson, Macias, and Maybank, are inferred to have actual knowledge of material information related to the Company's core business, and so suit against Paucek, Haley, and Lewis for improper stock sales under Delaware law would operate as a concession that Maeder, Stavis, Peters, Jarrett, Lewis, Rushing, Krawcheck, Larson, Macias, and Maybank had also breached their fiduciary duties.

31

## COUNT I
### Against All Defendants for Breach of Fiduciary Duty

106.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

107.    Each Individual Defendant owes and owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of 2U's business and affairs, particularly with respect to issues as fundamental as public disclosures.

108.    The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company.  The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of 2U.

109.    In breach of their fiduciary duties owed to 2U, the Individual Defendants willfully participated in and caused the Company to expend unnecessarily its corporate funds, rendering them personally liable to the Company for breaching their fiduciary duties.

110.    In particular, the Individual Defendants knowingly or recklessly made untrue statements and/or permitted the Company's public filings, disclosures, and statements to misleadingly report revenue and the Company's overall prospects.

111.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, 2U has sustained and continues to sustain significant damages.  Including direct monetary damages, exposure to liability from securities litigation and a loss of goodwill in the capital markets.  As a result of the misconduct alleged herein, defendants are liable to the Company.

## COUNT II
### (Against Paucek, Graham, and Mokkarala for Contribution
### For Violations of Sections 10(b) and 21D of the Exchange Act)

112. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

113. Defendants Paucek, Graham, and Mokkarala are named as defendants in the related Securities Class Action. The conduct of these Defendants, as described herein, has exposed the Company to significant liability under various federal and state securities laws by their disloyal acts.

114. 2U is named as a defendant in related securities class actions that allege and assert claims arising under § 10(b) of the Exchange Act. The Company is alleged to be liable to private persons, entities and/or classes by virtue of many of the same facts alleged herein. If 2U is found liable for violating the federal securities laws, the Company's liability will arise in whole or in part from the intentional, knowing, or reckless acts or omissions of all or some of the Defendants as alleged herein, who have caused the Company to suffer substantial harm through their disloyal acts. The Company is entitled to contribution and indemnification from these Defendants in connection with all claims that have been, are, or may be asserted against the Company by virtue of their wrongdoing.

115. As officers, directors and otherwise, Defendants Paucek, Graham, and Mokkarala had the power or ability to, and did, control or influence, either directly or indirectly, 2U's general affairs, including the content of its public statements, and had the power or ability to directly or indirectly control or influence the specific corporate statements and conduct that violated § 10(b) of the Exchange Act and SEC Rule 10b-5.

116. Defendants Paucek, Graham, and Mokkarala are liable under § 21D of the Exchange Act, which governs the application of any private right of action for contribution asserted pursuant to the Exchange Act.

4819-2304-1224, v. 3

117.    Defendants Paucek, Graham, and Mokkarala have damaged the Company and are liable to the Company for contribution.

118.    No adequate remedy at law exists for Plaintiff by and on behalf of the Company.

### COUNT III
### Against Defendants Paucek, Haley, and Lewis – *Brophy* Claim

119.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

120.    As alleged above, defendants Paucek, Haley, and Lewis are fiduciaries of 2U, possessed material, non-public information of 2U, and used that information to improperly profit from sales of 2U stock.  When Paucek, Haley, and Lewis directed the stock sales set forth above, they were motivated to do so, in whole or in part, by the substance of the material, non-public information they possessed, and they acted with scienter.

121.    When Paucek, Haley, and Lewis sold their 2U stock, they knew that the investing public was unaware of the negative material information that they possessed.  They also knew that if the information were disclosed, the market price of 2U stock would be significantly lower.  Paucek, Haley, and Lewis timed their stock sales to take advantage of the investing public's ignorance of the concealed material facts and obtain a higher price for the stock they sold.  They thereby benefitted by misappropriating 2U' non-public information.

122.    Plaintiff, on behalf of 2U, has no adequate remedy at law.

### PRAYER FOR RELIEF

WHEREFORE, plaintiff, on behalf of 2U, demands judgment as follows:

A.    Declaring that plaintiff may maintain this action on behalf of 2U and that plaintiff is an adequate representative of the Company;

B.      Against all of the defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the defendants' breaches of fiduciary duties, waste of corporate assets, and unjust enrichment;

C.      Declaring that Defendants have breached and/or aided and abetted the breach of their fiduciary duties to 2U;

D.      Directing 2U to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect 2U and its stockholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for stockholder vote, resolutions for amendments to the Company's Bylaws or Articles of Incorporation and taking such other action as may be necessary to place before stockholders for a vote of the following corporate governance policies:

1.      a proposal to strengthen the Company's controls over financial reporting;

2.      a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater stockholder input into the policies and guidelines of the Board;

3.      a proposal to strengthen 2U's oversight of its disclosure procedures;

4.      a provision to control insider transactions; and

5.      a provision to permit the stockholders of 2U to nominate at least three candidates for election to the Board;

E.      Extraordinary equitable and/or injunctive relief as permitted by law, equity, and state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on, or otherwise restricting the proceeds of defendants' trading activities or their other assets so as to assure that plaintiff on behalf of 2U has an effective remedy;

35

F.      Awarding to 2U restitution from defendants, and each of them, and ordering disgorgement of all profits, benefits, and other compensation obtained by the defendants;

G.      Awarding to plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

H.      Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Pursuant to Fed. R. Civ. P. 38(b), plaintiff demands a trial by jury.


Dated: August 21, 2020                  /S/ _____
                                        ANDREW RADDING, Bar No. 00195
                                        Adelberg, Rudow, Dorf & Hendler, LLC
                                        7 St. Paul Street, Suite 600
                                        Baltimore, Maryland 21202
                                        Telephone:      (410) 986-0824
                                        Facsimile:      (410) 986-082
                                        E-mail:         aradding@adelberg.com


                                        **GLANCY PRONGAY & MURRAY LLP**
                                        Benjamin I. Sachs-Michaels
                                        712 Fifth Avenue
                                        New York, New York 10019
                                        Telephone: (212) 935-7400
                                        E-mail: bsachsmichaels@glancylaw.com

                                                       -and-

                                        Robert V. Prongay
                                        Pavithra Rajesh
                                        1925 Century Park East, Suite 2100
                                        Los Angeles, California 90067
                                        Telephone: (310) 201-9150
                                        E-mail: rprongay@glancylaw.com

                                        *Counsel for Plaintiff Thomas Lucey*

36

DocuSign Envelope ID: A9C1C819-664F-43F9-A873-09005BC0DCB5

## **VERIFICATION**

I, Thomas Lucey, do hereby verify that I am a holder of common stock of 2U, Inc., and was a holder of such common stock at the time of the wrongs complained of in the foregoing Verified Shareholder Derivative Complaint ("Complaint").  I have authorized the filing of the Complaint.  I have reviewed the Complaint.  All of the averments contained in the Complaint regarding me are true and correct upon my personal knowledge and, with respect to the remainder of the averments, are true and correct to the best of my knowledge, information, and belief.

I declare under penalty of perjury that the foregoing is true and correct.

Date:   8/5/2020

DocuSigned by:

*Thomas Lucey*

D8673D8F6B374A9...

Thomas Lucey